## Case No. 7,216.

JANSEN v. The VROW CHRISTINA MAGDALENA.

[Bee 11.] [1]

District Court, D. South Carolina. Aug. 6, 1794. [2]

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

[2] [Affirmed by the circuit court (case unreported). Decree of the circuit court affirmed in 3 Dall. (3 U. S.) 133.]

BEE, District Judge. This is a cause of great importance, involving the law of nations, the faith of treaties, the rights of sovereignty and neutrality, the private rights of individuals, and the honour and justice of the United States. I have considered it maturely, and am prepared to give my judgment according to my best ability, faithfully, impartially, and agreeably to my view of the constitution and laws of the United States. In doing so, I am much relieved by the consideration that my judgment will not be final; for both parties have claimed that right of appeal wisely provided for them, and to which, no doubt, they will have recourse. The advocates on each side have, in the course of this investigation, entered into a vast field of argument; have contended for their clients, respectively, on a variety of grounds; and have displayed great ingenuity and legal knowledge. To repeat these arguments would be unnecessary; I shall only allude to such of them as appear most material.

The principal points for the decision of the court appear to be: 1st. Whether this court has any and what jurisdiction relative to matters arising on the high seas. 2dly. Whether the 17th article of the treaty with France restrain such jurisdiction; or whether the act of the 5th of June last controls it. By the third section of the judiciary act of congress [1 Stat. 73] it is declared that there shall be a district court in each district to consist of one judge, who shall hold four sessions annually, and special courts at his discretion. By the ninth section, the powers of the district courts are expressed, 1st, as to criminal, 2d, as to civil causes. The court shall have exclusive original cognizance in all civil causes of admiralty and maritime jurisdiction; and concurrent jurisdiction with the courts of the several states, or the circuit courts of the United States (as the case may be) where an alien sues for a tort only in violation of the law of nations, or a treaty of the United States. By the 2d section of

the 3d article of the constitution of the United States, it is declared, that the judicial power of the United States shall extend to all cases arising under the constitution and laws of the United States, and treaties made, or to be made. To all cases affecting ambassadors, other public ministers and consuls, and to all cases of admiralty and maritime jurisdiction. In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the supreme court shall have original jurisdiction; in all other cases, appellate jurisdiction under such regulations as congress shall make. The circuit court has no original jurisdiction; but has appellate jurisdiction in causes of admiralty and maritime jurisdiction; in which the district court alone has original jurisdiction. Redress must be had there, or nowhere. Suitors, however injured, would look in vain to the laws of this country for redress. They would be stopped in limine, and the appellate jurisdiction of the circuit and of the supreme courts would be virtually annihilated; since there would be no terminus à quo, no fixed point from which they might commence their procedure.

In addition to the clauses already recited from the judiciary act, the judges of the supreme court have by their decree in Glass v. The Betsey, 3 Dall. [3 U. S.] 6, decided that the several district courts throughout the United States possess all the powers of courts of admiralty, whether considered as instance or prize courts. That case was elaborately argued, and with great ability. The judges of the supreme court held it under advisement for some days, and then decided it so fully as to leave the jurisdiction of this court no longer doubtful. The question was considered as well with respect to the law of nations, as to the 17th article of the treaty with France; and, was fully set at rest on both grounds. But it is said that the act of congress of June, 1794 [1 Stat. 384], by declaring that the district courts shall take cognizance of complaints, by whomsoever instituted, in cases of captures made within the waters of the United States or within a marine league of the coasts or shores thereof, intended to oust them of all other jurisdiction. But the argument has no sort of force. Glass's Case [supra], had established the jurisdiction of the court in cases of neutral or American property captured on the high seas and brought infra praesidia of our courts. It was there determined that, under such circumstances, the American citizen, or neutral, might institute his suit in the district court, and obtain redress from it. But the act of congress now relied on goes farther, and enacts that, if our jurisdictional limits are violated, restitution shall be made even to a party belligerent who shall complain to the court, and prove his case to come within the provisions of that act. The sixth and seventh articles of the treaty with France assert and recognize the same right. Holland, Prussia, and Sweden have done so by their several treaties with us. No state could maintain its peace or sovereignty, if it were otherwise. I have no hesitation, therefore, in pronouncing that the district court has full jurisdiction upon the present occasion.

I shall proceed to examine the claim and answer of Talbot upon the other grounds stated therein. This claim is filed on behalf of the owners, officers, and mariners of the private vessel of war L'Ami de la Point-à-Petre, duly commissioned, armed, and equipped under the French republic; and all the above-mentioned persons are stated to be French citizens. The replication denies this; and we must examine the evidence to determine the fact. The exhibit C., by the claimant, proves that the said vessel was, on the 31st day of December last, called the "Fairplay," of Norfolk, in Virginia; was owned by John Sinclair and Solomon Wilson; was equipped by them with eight guns, one hundred weight of gunpowder, some shot, and sundry stores. That she was sold at Point-à-Petre by William Talbot, as agent or attorney to Sinclair and Wilson, to Samuel Reddick, a native of the United States, who purchased her as having a right to do so, being a naturalized French citizen, made such by the municipality at the above place, three days before. The American register was then cancelled, to be returned to the department that granted it, for the purpose of avoiding any penalty under our revenue laws. The exhibit A. is a certificate from the municipality of Guadaloupe, stating that William Talbot, a native of North America, was, on the 28th day of December, admitted a citizen of France. Exhibit E. is a like certificate that Samuel Reddick, a native of North America, was, on the same day, admitted a citizen of France. Exhibit B. is the commission of the governor-general of Gaudaloupe, authorizing Samuel Reddick, living at Point-à-Petre, to fit out for war, under the command of Captain Talbot, the said schooner called L'Ami de la Point-à-Petre. It bears date 2d January 1794. The power of attorney from Sinclair and Wilson to Talbot, authorizing him to sell their vessel, is dated 24th November 1793. From these different exhibits it appears beyond a doubt that this vessel was fitted in the United States, with guns and powder. That she sailed after the 24th November, because the power of attorney is dated on that day. That Captain Talbot, and the new owner, Reddick, were made citizens on the 28th December. That on the 31st the bill of sale was executed, and that, on the 2d of January, she was commissioned as a privateer. It has been insisted on that Talbot's answer must be taken as evidence, unless contradicted by more than one witness; because the oath of a party is equal to that of any other single person This is only to be understood of cases where a party is made a defendant; but does not hold so strongly

where a voluntary claimant comes forward to swear in support of his claim. In Gilbert's Law of Evidence (56) there is said to be a great difference between the evidence of an answer and a voluntary affidavit. Talbot could not have been examined as a witness in this case, because he is interested. Shall he then avail himself of the rule of law by being a voluntary claimant?

Laying aside, however, for the present, any examination as to the ownership of the vessel, which does not seem material, we will proceed to the question of expatriation, which has been brought forward in support of Talbot's right. I have perused with attention the cases cited on both sides as to the right of expatriation and emigration in the general manner there laid down, where no legal prohibition exists, and no prejudice is done thereby. The act of naturalization of congress, and the constitution of this state concur to sanction this doctrine: and we should with an ill grace refuse to our own citizens what we thus hold out to others. The proclamation of the president of the United States tacitly acknowledges the right contended for. It announces that no protection would be granted to such citizens as should by their own acts render themselves liable to punishment or forfeiture under the law of nations; and threatens prosecution against such as should, within the cognizance of our courts, violate the law of nations with respect to any of the powers at war. Much time was taken up in inquiring whether the certificate of Talbot's citizenship was agreeable or not to the laws of France. If the question turned on that point, I should have no doubt that the certificate from the municipality of Guadaloupe, as it is duly authenticated, ought to be received in evidence. We have no right to inquire whether the governor conformed to their constitution or not. We know that the national convention has suspended many of the articles of the new constitution for the present; and who is to question their power to do so? But, while I admit this evidence so far, I think it incumbent upon me in this place to notice a variety of certificates, that have been made exhibits in this cause, from the French consul, and his chancery. The 5th article of the consular convention with France fixes the right of the consul as to what acts he may receive in his chancery; and declares that copies of such acts, duly certified under the seal of the consulate shall have such evidence, in the courts of the United States, as their originals would. Of the certificates before me, not one conforms to this regulation; and the consul of France must have been induced to give them either from ignorance of our modes of practice and rules of evidence, or to get rid of the importunity of the applicants.

Admitting, however, the validity of the certificate from the governor of Guadaloupe, the question occurs: had Talbot, a citizen and native of the United States, any right to accept a commission to cruize against the subjects of the United Netherlands, who are under treaty of amity and commerce with us, even if his vessel had been altogether fitted in a foreign port? The 19th article of the treaty with Holland expressly says, that such persons shall be punished as pirates. The 15th article of the same treaty declares that all vessels and merchandize which may be rescued out of the hands of pirates and robbers, on the high seas, without the requisite commissions, shall be restored to the true proprietor. The 16th and 21st articles of our treaty with France are exactly conformable to the preceding article of the treaty with Holland. Now if a native and citizen of the United States, acting under a British or Dutch commission, had captured a French ship and brought her infra praesidia of our courts, we should have been required to restore, and must have restored her. The Dutch owners are equally entitled to our justice.

It is contended that the 22d article of the treaty with Holland says, that nothing therein contained shall derogate from the 9th, 10th, 17th and 22d articles of the treaty with France. If the 16th and 21st articles had been added to the above, this might have been strong ground; but it cannot be maintained that the 17th article (which gives permission to the ships of war or privateers of France to carry their prizes where they please, without being subject to arrest in our ports,) is in any manner derogated from, when, on production of their commissions, which they are bound to shew, it appears that the captain and crew have, from their connexion with the United States, violated another treaty, for the due performance of which we are equally bound; especially when that treaty is in strict conformity with the 16th and 21st articles of our treaty with France, under which we may, hereafter, be called on to furnish redress in cases similar to the present. If a native and citizen of the United States, guilty of treason against them, should, in order to divest himself of his allegiance, and get rid of the consequences of his crime, expatriate himself, and, within three days after, take a commission to act against us, such a step would not, I conceive, exculpate him, or save him, if taken again, from the punishment he would justly merit. That one of our citizens should expatriate himself solely with a view to make war against those with whom we are in treaty of peace and friendship, cannot amount to treason against the United States;' but involves consequences not much less important, and can never be sanctioned by our courts, or our private judgments. The quo animo must enter largely into all considerations upon this delicate question. For my own part, I do not deny, generally, Talbot's right to expatriate himself, and become a citizen of another country. But I assert that he has no right,

in his new character, to injure the country of his first and native allegiance, by open violation of her treaties with friendly powers. If he does this, he makes himself amenable to the justice of that country; and, if found within her jurisdiction, will be liable to the penalties established by her laws.

As to Ballard, all the facts stated against him in the libel are admitted by his default, and proved by the evidence before the court. The commission from Admiral Vanstable to John Sinclair appears to have been granted for special purposes; first, to prevent the sailing from Norfolk, of some vessels supposed to be fitting out there, with a view to give intelligence of the sailing of the French fleet: but, that having been previously done by the inhabitants of Norfolk, she was next employed as a lookout vessel, to prevent any surprise to the fleet in Hampton Road, or the carrying of intelligence by vessels out of the Chesapeake. The commission is dated on board the Tigre, on the 3d of April. The French fleet was then lying in Hampton Road, but sailed from thence on the 17th, and this vessel accompanied them. On the 20th she arrived in Charleston, not in distress, not armed: the embargo was then in existence. Sinclair, to whom the commission had been granted, having stated to the French consul his inability to go to sea, the consul appointed Ballard in his stead. But, in so doing, he exceeded the powers given him by the consular convention, which relates altogether to acts of a civil nature, and to ships of a civil character. But the substitution in this case is of a military sort, and so the consul himself understood it; for, he states, in his letter to the collector, that the vessel is commissioned by Admiral Vanstable, is destined by him to a secret service of importance, and must be allowed to go to sea, the embargo not relating to vessels so circumstanced. But the embargo comprehended all vessels not military; and the consul's power is restricted by the convention to those of a civil character. Ballard was, of course, substituted for Sinclair without due authority.

The consul's application to the collector bears date on the 3d of May. The brigantine was taken on the 16th. In the interval, it has been proved that Ballard's vessel went into the river Savanna, and there took on board guns and ammunition. She has since come into the port of Charleston with her prize. If she ever was charged with secret despatches, or sent on a secret expedition, by Admiral Vanstable, she has never executed her commission. There is not a tittle of evidence to show that Ballard ever became a French citizen, or went into a French port. The admiral's commission to Sinclair was, as appears in evidence, no way improper; it does not authorize a fitting for war, or the capture of prizes. Such commissions, given in our ports, had lately been declared void by proclamation of Fauchet, the French minister. Such as had been previously issued, were by that authority, recalled; and the admiral knew his duty too well to contravene the same, in a few weeks thereafter, and in breach of the laws of neutrality, and of nations. Ballard, therefore, had no authority to capture. The claim put into the libel acknowledges this, and at the same time confirms what his silence had before shewn, viz. that the prize was taken from him, because he could shew no commission. Had the matter rested here, and had Talbot been duly authorized, this capture, unless collusion had been proved, might have been good. But the evidence before the court proves that they cruized in concert. That, on the following day, they captured another vessel, and manned the prize with a party from each vessel. When they were threatened with recapture, Ballard took back his men; and returned them on board the prize as soon as the fear of recapture had vanished. And though Talbot has sworn that he took the prize from Ballard, because the latter had no commission, yet the prizemaster and crews of both vessels remained on board, till her arrival in Charleston. It appears, too, that the capturing vessels were in company, and did not separate till two nights before.

From such a mass of positive and circumstantial evidence I feel myself compelled to conclude that Talbot and Ballard cruized together by a concerted plan. That the prize was taken by Ballard, and collusively resigned to Talbot, because Ballard had no commission, and had armed and equipped his vessel in a port of the United States. I do not call in question the general right of France to capture the ships and property of her enemies on the high seas, and to refer the question of prize or no prize to her own tribunals. But if France has belligerent rights, the United States have a neutral character to maintain, and neutral duties to discharge. I am influenced by that consideration, by respect for our own sovereignty, and by regard to the law of nations, in decreeing, and I do, accordingly, judge, order and decree that the claim of the above named William Talbot, and his plea to the jurisdiction of this court be dismissed with costs. And I do further order and decree, that the brigantine Vrow Christina Magdalena, with her furniture and apparel, and the cargo on board at the time of her seizure and detention, be delivered over to the actor in this cause on behalf of the original owners of the same.